I'm David Melasky, and I represent appellates in this case. This case is a challenge based on arbitrary apprecious to the decision of the IRS not to grant a partial claimant plan. I'd like to refer the court to Judge Owen's analysis in the State of Duncan v. the IRS 895.3.192, where Judge Owen says that a review of a CDP case, the IRS abuses its discretion if it acts arbitrarily, capriciously, or without basis in factor law. And that's why we're here today, Your Honor. I would also like to refer the court to the decision of Judge Duncan in Southwest Power v. U.S. EPA in April of this year, 9-20, Feb. 3, 999, at page 1014, where Judge Duncan says, unexplained and seemingly illogical decisions are arbitrary and capricious. That's why we're here. The actions of the IRS with regard to appellants were arbitrary and capricious in five ways. One, is it arbitrary and capricious to require as a condition of approval that a taxpayer take an action which the taxpayer has no legal right to do? Can the agency ignore its own fact findings, which the agency did in this case? The third is, can an agency, as a condition of obtaining a governmental approval, require that the taxpayer take an action prohibited by law? And finally, not finally, can a governmental entity penalize a taxpayer for an action taken by the government? And finally, after reading the brief of the IRS, it becomes very obvious that there is no regulation, there is no guideline, there is nothing but the arbitrary and capricious decision of the IRS how to handle their self-imposed requirement that assets must be liquidated. They don't have to liquidate all the assets according to their own manual. The IRS says that manual isn't mandatory. They can ignore it if they want. I may be missing something here, but you, of course, are addressing, it seems so far all you've done is address the personal payment plan in your comments. Am I missing something? I just, no, you're not. Are you not, I mean, you don't have to argue anything else. It's in your brief, so we'll consider it, but I haven't heard the first issue yet. Well, the first issue, Judge. And you're not required to. I just want to make sure I'm not missing something. No, you're not. If I have to, I don't get time. I'm more concerned with the partial payment plan because that's what appellants need. Let me just ask you a quick question on that first issue, and then you can get back to the partial payment. The check that you and your wife presented on the 27th of January, 2011, and the IRA, excuse me, IRS delayed processing, I couldn't tell whether you were, you seem to be saying that they did, that they delayed the presentment intentionally so that they could issue that levy for another period. Am I incorrect in that? That's what I presume, Your Honor. But you just presume it. You don't have any evidence to support it. Other than the fact that they undid it after they had already credited the payment. Then, after they seize it, then they decide, oh, well, that's not a valid payment. So the IRS created the problem by seizing it. I think their record means that they intentionally decided to do something. You don't have any evidence other than that, you presume? That's correct. Thank you. Okay. Is there a way you could have paid other than by check? Well, you could take cash. I'm not sure I'm real... Or certified cashier's check? Yes, you can take. And in fact, that's a real problem with this issue because I've noticed that because it has my name, if I look at my name, I see that there's something out there. Don't pay the IRS with the check if you have any issues. That's a real public policy issue. Are people going to be scared to pay the IRS if they have a... I have an issue here. All right. Unless I'm missing something. Okay. Let me talk about the two primary things at the IRS. They claim we didn't liquidate all assets. Not true. We did everything we could. Now, was there a sale of the Exxon stock? No, because I did everything the legal right to do, which is to tell the IRS I will sign anything that allows that, that allows you to do it. That's all you could do is what you're... I will give you all my interest. That's all one could do. The second thing is they claim that the life insurance... Clearly, our attorney wrote them and said, we're going to lose the life insurance at the last minute when they never responded to that. He said, well, can't we at least pay it? Now, according to the IRS, that's about $2,500 for the Exxon stock, about $1,100 for the life insurance, $3,600, but we're offering to pay and asking this court to allow us to pay 1017 when the IRS says their financial analysis says we can't. So we're offering to pay $188 a month. By my rough calculations, that means in 20 months they would have gotten that amount of money anyway, and they would continue to get the extra $188. We feel like 1017 would be a fair payment. In the brief, it points out that they said two accounts are being liquidated and it's going to be provided to the IRS. How could that not be turning over the assets? Finally, let's get to the trust. With the trust, they say, Audrey, you go take money out of the trust as if you need it, but we know you don't need it because you're earning your living. Then you pay it and you agree to do this, and you pay it as if you needed it, but instead you give it to the IRS and you sign a contract agreeing to do that. That's invading a spendthrift trust. What's really the fallacy in that argument is I doubt they would have ever even made that demand if there was a corporate trustee, say Chase Bank. You wouldn't go to Chase Bank and say, pretend she needs the money. Take the money out. Yeah, she's working. Yeah, she's covering her expenses, her household expenses. Pretend you need the money. She needs the money and give it to the IRS. It's just an invasion of the spendthrift trust, and it would have been illegal. In looking at the IRS's position, they take the position that they don't have any binding guidelines that a taxpayer can look at and say, oh, this is the criteria I have to meet in order to liquidate the assets. For one thing, it says in their brief from their manual they don't have to require in every instance assets be liquidated. Who makes that decision? What is the criteria? They also say they don't even have to follow their manual. It's not in essence. So what is the criteria? There is nothing in the statute, in the 2004 amendment to the tax code that allows for a partial payment that says assets have to be liquidated. Congress didn't create that. There is nothing in the IRS regs that talks about assets being liquidated. Congress didn't create that. The IRS didn't create that. So they have this whatever the particular officer that's dealing with the taxpayer wants to do is now the criteria and in our case, when we ask for some additional concerns for the reasons that are set forth in the brief, all of a sudden they say notice of determination. We're not going to agree to that. I believe the case of Martin v. Ruiz, it's not in the brief, 415 U.S. 199, 1974, talks to this and what it says is you can't, and it had to do with dispersing money allocated to Native Americans. It says no matter how rational or insistent with congressional intent a decision might be by the administrative officer, the determination of eligibility cannot be made on an ad hoc basis by dispenser of funds. Now, that may be giving out funds, but determining what your requirements are, what the timelines are, which assets have to be liquidated, there is no guideline, and I think that's arbitrary and capricious per se. Each individual settlement officer can't have whatever standard that you don't know until it's too late when they turn down your plan and your next thing is you're in the tax court. We would respectfully request that this court find that the decision, excuse me, that the decision of the IRS to deny the partial payment agreement was arbitrary and capricious for the reasons I've just enumerated. We would also suggest that it's inherently arbitrary and capricious to say we've accepted your payment. In their own internal records they accept our payment, then they go out and seize it. Then they want to impose $300 as an overdraft fee when they created the problem. But they also created the problem of the taxes not being current for the 2009 year. So, to me, when the government goes in and takes something where they've already accepted payment, whether they cleared the check or not, they made the decision to hold the check. Do I know why? Judge, no, I don't know why. I just know the fact is all they had to do was undo it. If it wasn't a deliberate decision initially, it was a deliberate decision later. You could tell the check hadn't cleared. Did you call them and say, is there an issue? It always takes a while for those checks to clear from the IRS in my experience. So it never occurred to me. And in fact, I got the levy before I found out it didn't clear, or the notice of intent. Well, actually the levy because they levied it and took that and another $3,000. I don't know how long. I had asked for 12 a night, but it looks like I'm on 15. Yes. You can save that time. Okay, thank you. May it please the court. Good afternoon. My name is Paul Aloulis from the United States Court of Appeals. This court should affirm the decision of the tax court because the tax court was correct that the Office of Appeals of the Internal Revenue Service did not abuse its discretion when it determined not to reapply the proceeds from the levy of January 31st against the taxpayer's 2009 income tax liability when the levy was in fact on account of other interests. Why did the IRS hold that check so long? Your Honor, there is no, I understand that the appellants have argued that the IRS held the check for a long period of time, but in fact there's nothing in the record to indicate exactly how long the check was held until it was presented to the bank. The proceeds from the levy were turned over from JPMorgan Chase Bank to the IRS, it appears, on February 28th, while the levy was issued on January 31st. However, there's nothing in the record to indicate when exactly the check was presented to the bank for payment. When was it sent to the IRS? The check was delivered to the IRS by hand on January 27th, which was a Thursday, to the Houston office. Then on January 31st, which was a Monday, the Philadelphia office of the Internal Revenue Service issued the levy to JPMorgan Chase Bank. So there was only two business days or less between the time that the check was hand-delivered to the office in Houston and the time when the levy was issued from the office in Philadelphia. A notation was made when the check was handed to the Houston office, is that right? Explain that to me, what kind of notation? When the check was turned into the Houston office, they entered the check into the records of the Internal Revenue Service, which indicated that they had received a check in the value of $18,000. That was a notation made to the taxpayer's account. For a particular year, is that correct? It was applied to the 2009 tax year as the taxpayers requested when they delivered the check. Why isn't that binding on the IRS? Because the check was never honored, Your Honor. The check was not honored when it was presented to the bank for payment. Because the IRS had levied on the account. That's correct, yes. And the levy, and I think this is an important point to make here, the levy, first, is not at issue in this CDP proceeding, and second, despite the fact that the levy is not at issue, all of the tax court judges, including Judge Holmes, who dissented in this case, found nothing wrong in this levy by the Internal Revenue Service. The Internal Revenue Service had previously issued all necessary notices in order to be allowed to execute this levy, and the taxpayers were subject to levy at any time from the time when all of those prior notices had been issued. So there's no concern here that this levy was improper. And in fact, the levy is not at issue in this case, and this is an important point to make, I think. In this case, the taxpayers requested a CDP hearing for a number of years. As it turns out, they were only entitled to a hearing at the IRS Office of Appeals for three years, 2006, 2008, 2009, because they had previously received notices with respect to all of those earlier years, and the time for them to request a hearing with respect to all of the earlier years had previously expired. Now, the levy in this case— Can I ask you about— Yes. I'm sorry. The IRS office in Philadelphia is the one that did the levy, is that right? That's correct, Your Honor. Okay. Is there any evidence that the office knew about the notation on the taxpayer's record that a check had been delivered? There's nothing in the record to indicate that, Your Honor. But even—and this is the point that I'm trying to make—even if the Philadelphia office had been aware of the fact that the taxpayers had presented a check for 2009, that would not have prevented this levy, because this levy was on account of earlier years. It was on account of the years 95, 96, 99, 01, 04. You seem to be arguing, had they presented a certified check or money—not a money order, but the equivalent—the funds would have already been taken out of the bank for that check, you would have applied that money to where they wanted it applied, and the levy would have captured the lower amount. That's correct. Yes. If they had presented a certified check or cash to the Internal Revenue Service, then in fact— This really is just a timing issue. I mean, it seems like the IRS is being somewhat arbitrary and saying, well, if they'd just done it this way, we wouldn't be here. Well, no, Your Honor, it's not at all arbitrary. They tendered, at the time, a check that had sufficient funds in the bank account to cover it. You all noted that it was supposed to be applied a certain way, and then you went and levied on the account, which caused the check to bounce. Yes, and in fact, the check bounced, and I think that that's the critical fact here. The check is not a payment, and even Judge Holmes, again, agreed with this under Section 6311B of the Internal Revenue Code. The check is not a payment until it is honored by payment— But you're charging them with all this. The consequences for your treatment of this are fairly severe. It would have been a minor thing to honor the notation and say, well, we are going to credit the amount of the check to the 2009— Well, two points, Your Honor. First, I don't think the consequences here are severe. In fact, the IRS seized $21,000 from the account, and the taxpayers received $21,000 of credit against their very substantial income tax liabilities. So it's not as if the money was not applied to their taxes. It simply wasn't applied to the tax years that the taxpayers wished them to be applied for, and I would like to come back to that in a moment. But second, because the funds were seized by levy, the Internal Revenue Code prevents the IRS from applying them as the taxpayers wished that they be applied, because the code requires that when a levy is executed on account of a particular tax liability, any proceeds received as a result of that levy must be applied against that tax liability. And that's why it matters to—it's important to examine which years were involved in the levy. The legal ability to apply those levy proceeds to the 2009 tax year, it wasn't part of the levy. And so, in essence, the taxpayers here are actually asking this court to order the IRS to do something that the code prohibits it from doing. And that's in the code. Does the code make any provision for a taxpayer being able to direct where a tax payment is credited? Not the code, Your Honor. It's a matter of IRS policy. What does the policy provide? When a voluntary payment is made to the Internal Revenue Service, the Internal Revenue Service generally will follow the written instructions by a taxpayer as to where those payments should be— The problem here, you're saying, is that the presentation of the check does not constitute making payment. That's correct. Payment by check is not completed until the check is honored after presentment to the bank. And again, that's clearly stated in the code. What if there were evidence that—I mean, what if the check had been presented to the bank, and everybody knew that the check had been presented, and there were evidence that the IRS intentionally didn't cash the check so that it could do a levy? Does that change the analysis at all, in your view? I think that that's the concern that's stated by Judge Pugh in the concurring opinion. I don't think it actually changes the answer. But you could do that. Because of—I think the taxpayers certainly would have a stronger argument. But I think because the code requires the service to apply levy proceeds to a year for which the levy was made, that the analysis would have to be the same. Once the levy is executed, a lawful levy, which I think is an important point to make, it's a lawful levy. It's a levy that's allowed by the code. They followed all procedures necessary in order to make that levy. And so I think that probably even under those circumstances, which aren't the circumstances this year, but in answer to the Court's hypothetical, I think the code would still require the same answer, although surely some of the tax court judges posited that as a possible change that might change the answer. When the check was delivered—I don't want to get into the banking term, presentment—the levy took place for $21,000. Then the check was presented to the bank, and there were no funds, insufficient funds. When the levy issued on that Monday, the IRS had no way of knowing how much was in its account, did it? It did not. It did not know it was going to cause a check to bounce, to use the common term. No, Your Honor. It had no way of knowing that. That's correct. At the time, was it about $350,000 in back taxes owed? Yes, Your Honor. Going from 1995 through 2009, $344,000 at the time. That's correct. And again, they were subject to levy for that entire—at any moment, a levy could have issued to seize any of their assets or any of their bank accounts. But that's correct, Your Honor. In general, the IRS is not aware—I don't believe, unless they've issued some type of administrative summons or something to a bank—they're not aware of how much— That's not in the record, is it? It's not. So there is no evidence that the IRS said, oh, wait, here we got a check for $18,000. Let's grab everything. They were just—you had two things on two parallel tracks. There's no evidence they were linked. There's no evidence that they're linked, Your Honor. That's correct. And I think another point to make here, going back to the fact that the full amount of this money was, in fact, credited against the taxpayers' substantial income tax liabilities, the reason— You have a swing of $360. That was the overdraft charge. Right. And I don't know the circumstances of that. I believe, but I'm not certain about this, that that may be an automatic entry that once a notation goes into the computer system for a return check, that that's an automatic thing that happens. But I'm not certain about that. But, yes, Your Honor, at the end of the day, it's an additional $360,000. And really the reason why this ends up mattering is it has to do with the statute of limitations for collection. And the taxpayers raised this in the CDP hearing. They asserted their belief that the 1995 taxes had already ceased to be collectible by virtue of the statute of limitations. Because of the many different times in the past when the service had entered into installment agreements or offers in compromise or other things with the taxpayers, each one of those episodes extends the statute of limitations further. And so, in fact, the statute of limitations had not expired. If it hadn't, if it had expired, would the levy then—could the levy not have been for that particular—applied to that particular year? It would have been applied to 1996 or 1999 or 2001, one of the other years that was at issue. And so, really, at the end of the day, what this case is about is, not was the levy proper, but where should the levied funds be applied? Where should those levied funds be applied? And under the Code, the funds can't be applied to a year that wasn't one of the years that was the subject of the levy. And 2009 was not one of the years that was the subject of the levy. I just want to understand, because I found your reg, and it was from Judge Pugh's concurrence—and you probably said this, but I just want to understand it. It says, if the taxpayer voluntarily tenders a partial payment that is accepted by the service, then—that's the quote—and then you have to follow their specific written directions as to application. That's correct. And your argument is, I mean, I guess there was a voluntary tender, or was there not? We agree with the majority of the tax court that there was no payment here, that it's a payment that's required. And, for example, if the taxpayers had presented this $18,000 check, and some other creditor, before the check was presented to the bank for payment, if some other creditor had managed to obtain some type of lien action on the account, the IRS, surely in those circumstances, would not be bound by simply the presentment of that check, that delivering of that check to the service. It has to be a check that's honored. And, again, that's under 6311 of the Code. Payment by check is not credited until the payment is honored by the bank. Referring to the personal payment plan? Excuse me, Your Honor? Referring to the personal payment plan? Yes, Your Honor. Again, Your Honor, the tax court was correct in finding that the service did not abuse its discretion in denying the partial payment plan that was suggested by the taxpayers. And, again, there are two issues involved in that particular aspect of the case, the first being the question whether the taxpayers had, in fact, liquidated all of the assets as the settlement officer had requested, and the second issue being whether it was in any way improper for the settlement officer to consider the possibility that Mrs. Payne would take distributions from the trust in order to pay her living expenses. And the tax court was correct that the settlement officer and the appeals office ultimately did not abuse its discretion in how it decided both of those issues. With respect to the liquidation of the assets in particular, as the tax court found, in this case, there wasn't simply a matter of failing to liquidate assets, but failing to be prescribed by the settlement officer. In this case, the deadline for doing so was extended multiple times before the settlement officer finally said, okay, you haven't completed this process within the time prescribed, and, therefore, I'm going to issue the decision saying that that hasn't happened. And, in particular, with respect to the Exxon stock, it is a fact that the Mulaski simply declined to liquidate that stock. Now, understandably, Mr. Mulaski indicated that he apparently felt uncomfortable or something about going back to discuss that issue with his ex-wife, who he hadn't spoken to in 30 years, but the fact is they didn't undertake to do that. And, as the tax court pointed out, simply offering to turn that asset over to the IRS, just give up whatever rights you have in it, isn't something that can actually happen, because it also belongs to someone else. So, you know, there's no way to sort of just turn over your interest in that asset. And it certainly didn't happen within the time period that was prescribed. With regard to the distributions from the trust, again, the settlement officer, I think, appropriately considered the fact that Mrs. Mulaski had the ability to make discretionary distributions to herself in order to pay for her own personal living expenses. And when considering these partial payment installment agreements, I think it's very important to focus on the fact that what we're talking about is, in fact, a partial payment. You're asking the service to compromise, in some significant way, the amount of money that you're going to pay against your tax liabilities. And so when the service is doing that, it requires that the taxpayer pay the maximum amount that they can afford to pay each month within that period. If the taxpayer doesn't pay their full tax liability, it falls upon all other taxpayers in the country to make up that difference. And so they definitely do negotiate and enter into these partial payment agreements. But when they do, they require taxpayers to pay the full amount that they can pay. And there are standards that are laid out for how that happens. They examine the amount of income that the taxpayers have every month, and they compare against that the amount of allowed expenses, which is done geographically around the country for housing, for whatever expenses you may have that are allowable. And when they do it, they consider all possible avenues of income for the taxpayers to receive in order to satisfy their obligations. And that's all the SO did here. This was not an attempt by the IRS to levy this trust account. It was not an attempt to seize the trust account. There was no attempt in any way to take this trust. It was simply the SO looking at the trust and saying, ah, well, Mrs. Mulaski, as both the trustee and the beneficiary of this trust, you have the ability to distribute these funds to yourself in order to pay for your own personal living expenses. And if you exercise that ability, then you can now pay $4,700 a month against your outstanding income tax liabilities. Simply taking that into account, the fact that that ability was available to Mrs. Mulaski was not an abuse of discretion. And for those reasons, we urge this court to affirm the tax code. Respond to the argument that counsel presented that, in fact, you were requesting his wife to do something illegal. Well, there's nothing of it. A spin-thrift trust. Well, again, Your Honor, this was not an attempt to attach the trust. This was not seeking any court intervention, not seeking any court order, ordering the trust to be turned over. It was not a seizure of the trust. It was simply taking into account the fact that Mrs. Mulaski had these substantial funds available to her if she chose to access them. And, of course, Mrs. Mulaski is entitled in her position as trustee of this discretionary trust and as beneficiary to not take those distributions. She's entitled to do that, to make that choice. Just as she's able to make the choice not to pay her substantial taxes. But the IRS is not required to agree with that choice, especially when what it's doing is agreeing to compromise a very substantial tax liability for a much lower amount. The trust had a value of around $260,000. Approximately. I believe that's correct, Your Honor. Yes. And so for those reasons— That's basically two-thirds of the tax liability. It's a very substantial portion of the tax liability. That's correct. Yes. And for those reasons, we urge this Court to affirm the tax court. Thank you. May it please the Court. I think I have seven and a half minutes. First of all, if we could have given that $230,000, we'd have been glad to have this case, and I could have been doing something else today, and y'all could have heard a different case. I don't believe that's in the record, is it? It's not going to be in the record, Your Honor. The point is, he said we had discretion. We didn't have discretion. There is a trust. There are other beneficiaries— But you're, you know, you're the person coming to the IRS and saying, please let me just make a partial payment of this $350,000 I owe in taxes. And they say, well, one way you could do it is get these payments out of the trust. Well, you elected not to do that. I didn't. We didn't elect, Your Honor. First of all— Well, you didn't do it. But again, you're the one making the offer. It's not like they're forcing you to come to them and say, can we have a partial payment plan? You owe $350,000 going back to 1995. And so it's not like you're being put upon by the IRS. They're trying to get the money you owe the government. You're not contesting you owe the government this money. Your Honor, Congress created this for people like us so that Congress would get the revenue. It wasn't created until 2004 when you could have a partial payment agreement. The bottom line is they looked at it and they figured out, without the trust, we could pay $829 a month. Now, the point is Congress created the mechanism recognizing that the most effective way to get the money we need to run the government and to have taxpayers who are behind in their taxes— I'm sure I'm not the only one who's ever been behind in my taxes. Please stand in front of the microphone. I apologize. I apologize. Sir, I would suggest you were more than just behind in your taxes. $350,000 going back to 1995. Well, that had to do with some bad years when we had an offer in compromise that took care of 1995. Then we had some bad years, couldn't make our current taxes, and so they go back and they add penalty and interest. So this started out with about $40,000 being owed and then a few thousand other years, and it's mostly penalty and interest. It's not mostly earnings. I didn't have a million-dollar year and this is $350,000. In fact, in the record, I think there's something about the taxes, and you can see. This isn't something—there's not an island that we own in the Caribbean or anything. This is not tax fraud. This is an attempt to pay our taxes. And the bottom line is I think what you think, Judge Barksdale, is what the IRS thought. We're going to get money out of these people regardless we're going to have to do it. That's not what I think, counsel. I apologize for saying that. I should not have said it that way. You shouldn't have. And I apologize. That was wrong. But, you know, I spent 26 years in the Army Reserve and did a lot of things on my own time. That doesn't count for anything. I do feel like I've tried to be a good American my whole life, Your Honor. And I don't want to cheat— You're not arguing to a jury here. Well, Your Honor, I apologize. But I really feel like that what we tried to do is everything we could do. I understand that you think that we did something that wasn't appropriate. That was never our intent. It was on the advice of counsel. It wasn't just me that said don't pay the taxes. It was also on the advice—don't use the trust. It was also on the advice of our tax lawyer. Because a spendthrift's trust is a spendthrift's trust. I can understand that the IRS wanted it. However, we couldn't. It's my understanding of the law that we absolutely couldn't. Otherwise, we're taking money from— We're taking the legacy that a man left behind just from a practical standpoint. But I want to go back, if I could, Your Honor. I want to go back to the fact that we did everything we could legally do as we understood the law. And we were represented by very effective counsel. I didn't have—I offered to sign anything I could with regard to the Exxon stock. It's only $2,600 according to the IRS. As I said, we're trying now to pay $1,000 a month when they say we can only pay $829. Again, I apologize for taking it personally, Your Honor. That's the problem with being pro se. And a lesson learned for me again. But we want to get right with the IRS. That's why I'm here today. Because I'm asking this Court to look at the record, to look at the law on spendthrift's trusts, to see if we're right on the spendthrift's trust. And if we are right, that's why we didn't do it. And if this Court agrees we're right on the spendthrift's trust, we made every effort we could. But I need to get back to one more thing. And that one more thing is the fact that there are no guidelines. Each officer can say, you have this much time, you have that much time. In the record on April the 4th of 2011, our attorney wrote, one of these has been requested, the Schwab account, since February. And we still haven't... Your time has expired. Okay, thank you. We have your argument.